ST. JOSEPH'S HOSPITAL,
INC., Plaintiff,

v.

HOSPITAL AUTHORITY OF AMERICA,
HCA Management Company, and Chatham County Hospital Authority, d/b/a
Memorial Medical Center, Defendants.

No. CV484–271.

United States District Court,
S.D. Georgia,
Savannah Division.

July 18, 1985.

J. Marbury Rainer, Rainer, Parker, Hudson, Rainer, Dobbs & Kelly, Atlanta, Ga., and William P. Franklin, Jr., Oliver, Maner & Gray, Savannah, Ga., for plaintiff.

Thomas A. Varlan, Sutherland, Asbill & Brennan, Atlanta, Ga., John M. Tatum, Savannah, Ga., for Chatham Co. Hosp. Authority.

Joe Sims, Kevin D. McDonald, Jones, Day, Reavis & Pogue, Washington, D.C., Sam P. Inglesby, Jr., Savannah, Ga., for Hospital Corp. of America and HCA Management Co.

## ORDER

EDENFIELD, District Judge.

Before the Court are the defendants' motions to dismiss plaintiff's complaint, as amended, against them.

### I. *Background*

This antitrust action arises over the provision of cardiac surgical services in the Southeast Georgia area. Plaintiff St. Joseph's Hospital, Incorporated ("St. Joseph's") is a Georgia nonprofit corporation doing business in Savannah, Georgia, as a licensed, nonprofit general acute care hospital. Amended Complaint at 2, ¶ 4. Defendant Hospital Corporation of America ("HCA") is a for-profit corporation in the business of operating both HCA and non-HCA owned hospitals worldwide. *Id.* at 3, ¶ 5. HCA Management Company ("HCAM") is a wholly owned subsidiary of HCA and has been under contract with defendant Chatham County Hospital Authority, d/b/a Memorial Medical Center ("MMC") to manage MMC.[1] *Id.*, ¶ 6. MMC also is a licensed, nonprofit, general acute care hospital in Savannah. St. Joseph's and MMC compete with each other in the health care services market in the Savannah, Georgia area.

In Georgia, hospitals must comply with state administrative and licensing requirements before they are able to build new hospitals or new patient care units in existing hospitals.[2] Adherence to this requirement is mandated by the state's "principal objective of ... health care cost control." *St. Joseph's Hospital, Inc. v. State Health Planning Agency and Chatham County Hospital Authority,* Civ. No. X84–4497–G at 8 (Chatham Superior Ct., May 6, 1985) (hereinafter, "*St. Joseph's I* ").

MMC currently provides cardiac surgical services in the Southeast Georgia area. St. Joseph's does not. St. Joseph's applied to the State Health Planning Agency ("SHPA") for a Certificate of Need ("CON")[3] to enable it to provide such services in competition with MMC.

The defendants have allegedly obstructed St. Joseph's efforts to establish a cardiac surgery program within its hospital by, *inter alia,* opposing in bad faith St. Joseph's October 1983 CON application before the SHPA. Complaint at 8, ¶ 21. That litigation is ongoing as of the date of this Order. Because most of the defendants' allegedly improper conduct revolves around that litigation, the Court will indulge in a more detailed history of it.

---

**1.** In its amended complaint plaintiff added recently incorporated Memorial Medical Center, Inc. as a party defendant. *Id.* at 3, ¶ 6A. MMC Inc. is currently operating Memorial Medical Center under a long-term lease. *Id.* at ¶¶ 37A–C. For convenience, the Court will refer to this and the other defendants as "MMC." In addition, the Court will refer only to the amended complaint in this Order, since it incorporates all of the original complaint.

**2.** *See* O.C.G.A. § 31–6–1 (state regulatory scheme is designed to ensure that health care "facilities should be provided in a manner that avoids unnecessary duplication of services, that is cost effective, and that is compatible with the health care needs of the various areas and populations of the state.").

**3.** *See* O.C.G.A. ¶ 31–6–40, *et seq.* (Any person proposing *to* develop new health services in Georgia must apply for a CON; CON applications are filed with the State Health Planning Agency (SHPA); interested parties may submit information in writing to SHPA concerning an application under review; appeals are made to the State Health Planning Review Board, whose decisions are subject to judicial review. *See, e.g., St. Joseph's I, supra; see also State Health Planning Review Board v. Piedmont Hospital,* 173 Ga.App. 450, 326 S.E.2d 814 (1985).

St. Joseph's CON application before the SHPA was complete as of November, 1983. In January, 1984, MMC sent a letter to the SHPA[4] (Complaint, Exh. A) which allegedly overstated MMC's capacity to provide cardiac surgical care to the public.[5] Plaintiff's complaint does not allege that plaintiff was unable to respond to this letter before the SHPA issued its decision. However, while plaintiff's CON application was pending, the SHPA adopted the "New Cardiac Surgery Rule" (hereinafter, the "New Rule") on February 10, 1984 (made permanent on March 1, 1984), which in effect imposed a two-year moratorium on new heart surgery programs in Georgia. In April, 1984, the SHPA acted on St. Joseph's CON application and denied same on the basis of the New Rule and, *inter alia*, because MMC's cardiac care facilities would be needlessly duplicated, especially in light of data, allegedly derived from MMC's letter, showing that only 30% of MMC's total capacity was being utilized. Complaint, Exh. B.

St. Joseph's appealed the SHPA's decision to the State Health Planning Review Board ("Review Board") on April 27, 1984. *Id.*, at 12, ¶ 33. Although MMC was not a formal party at this stage, it consulted with and advised the SHPA to move the Review Board to dismiss the appeal without a hearing. The SHPA did this, but it was denied by the Review Board hearing officer. However, that hearing officer advised the SHPA that he had previously represented plaintiff in another legal context and offered to disqualify himself upon the SHPA's motion. *Id.*, ¶¶ 34–35.

MMC, representing that it would not seek to delay matters, moved the Review Board to let it intervene. This motion was granted. *Id.*, at 12–13, ¶¶ 36–37. Two weeks later, MMC moved to disqualify the Review Board hearing officer because of his prior representation of the plaintiff.

*Id.*, at 13, ¶ 37(a). The Review Board Chairman, Joseph A. Sibley, disqualified the hearing officer and appointed himself to that position.

Thereafter, MMC moved to dismiss plaintiff's appeal on the same grounds stated in SHPA's earlier, unsuccessful motion. Before the Review Board ruled on this motion, however, MMC suggested that the appeal be postponed indefinitely. *Id.*, at 13–14, ¶ 37(c). The Review Board chairman agreed and stayed the proceedings until the validity of the New Rule and its application to St. Joseph's CON could be resolved by the courts. *St. Joseph's I, supra*, at 4.

In response, St. Joseph's sought injunctive relief through a declaratory judgment action filed in this Court, *St. Joseph's Hospital v. John A. Sibley, III, et al.*, CV484–266 (S.D.Ga. July 26, 1984), which was later dismissed. Sibley's stay order was subsequently lifted pursuant to a state court mandamus order. *St. Joseph's Hospital, Inc. v. Sibley*, Civ. No. D–12402 (Fulton Superior Ct., Aug. 17, 1984) (Williams, J.).

Complying with the mandamus order, a panel of the Review Board conducted a full evidentiary hearing in September, 1984. *St. Joseph's I*, at 4–5. At that hearing, the defendants "maintained and vigorously asserted the position that the New Rule was reasonable." Complaint at 14, ¶ 37(e). This position, however, "was in direct contradiction to their earlier expression of opposition to the New ... Rule in a letter submitted to the SHPA at the time the Rule was promulgated." *Id.*

In its decision of December 6, 1984, the Review Board panel found that St. Joseph's satisfied the CON requirements. *Id.*, at 14–15. However, the CON could not be issued because the Board had no authority to do so until the New Rule's validity was resolved in the related cases then on appeal to the Georgia Court of Appeals. *Id.* That

---

**4.** O.C.G.A. ¶ 31–6–43(e) (Michie 1984) specifies that "[a]ny interested person may submit information to the [SHPA] concerning an application, and an applicant shall be entitled to notice of and to respond to any such submission."

**5.** In one of its briefs, plaintiff refers to a second "misrepresentation" letter from MMC to the SHPA. For reasons explained *infra*, this letter will not be considered.

court, however, recently dismissed those appeals on jurisdictional grounds. *State Health Planning Review Board v. Piedmont Hospital,* 173 Ga.App. 450, 326 S.E.2d 814 (1985).

Upon plaintiff's complaint, the Chatham County Superior Court addressed the application of the New Rule to St. Joseph's in *St. Joseph's I.* Chatham County Superior Court Judge Cheatham, who permitted defendant MMC to intervene in the case before this court, *see Order Allowing Intervention of Memorial Center, Inc.,* Civ. Actions X84–4497–G, X85–0034–C (Chatham Superior Ct., May 6, 1985), concluded that "the Rule is unreasonable and arbitrary in its interpretation and application by the Panel." *St. Joseph's I,* at 13. He held that the rule, "as interpreted in a preclusive fashion and applied retroactively [to St. Joseph's], is invalid, and ... must be interpreted to allow the Review Board to approve St. Joseph's [CON] application in view of [the Review Board's] decision on the merits." *Id.,* at 6, n. 2, quoting *St. Joseph's Hospital, Inc. v. State Health Planning Agency,* Civ. No. X84–0992–C (Chatham Superior Ct., May 6, 1985) (companion declaratory judgment decision) (hereinafter, *St. Joseph's II*). Accordingly, the Review Board's decision was "modified to direct SHPA to issue a CON to St. Joseph's...." *St. Joseph's I,* at 25; Complaint at 16–17. In June, 1985, *St. Joseph's I & II* were appealed to the Georgia Court of Appeals. As of the date of this Order, no decision has issued from that court.

Among its more conclusory allegations in the case *sub judice,* plaintiff maintains that MMC conspired with the other defendants and unnamed individuals to prevent St. Joseph's from completing its plans to establish a cardiac surgery program within its hospital. Complaint at ¶ 15. Stated differently, that beginning in 1982, the defend-

ants, in violation of the Sherman Anti-trust Act, 15 U.S.C. § 1, "engaged in an unlawful combination and conspiracy to monopolize, and otherwise unreasonably restain, trade and commerce in the furnishing of medical-surgical hospital services generally, and in particular the furnishing of cardiac surgery services." *Id.,* at Count I, and ¶¶ 20, 50. These antitrust activities, which in part consist of bad faith efforts to oppose St. Joseph's institution of cardiac surgery and other tertiary services, are continuing, alleges plaintiff. *Id.,* at ¶ 21. The defendants' activities are designed to preserve MMC's monopolistic position in the relevant health care market detailed in plaintiff's complaint. *Id.,* at Count I & ¶ 21.

Without such service unit in its hospital, St. Joseph's is compelled to transfer those patients needing cardiac surgery to MMC, its competitor. St. Joseph's thus loses desired medical staff and patient business, while MMC enjoys corresponding monopolistic fruits and patients must endure both increased costs and health risks. *Id.,* at ¶¶ 27–30, 41–48.

Another example of MMC's bad faith conduct, according to plaintiff, is its actions regarding National Medical Enterprises, Inc. ("NME"). NME was required to submit a "Certificate of Need" ("CON") to the state in order to build a new, medical-surgical hospital in West Chatham County, Georgia. Plaintiff alleges that after opposing NME's application, HCA and MMC submitted their own, more costly proposal. Plaintiff further alleges that this was done in bad faith and in an effort to provide MMC with "control over almost half of the acute care hospital beds in the Savannah area." *Id.,* at ¶¶ 22–25.[6]

St. Joseph's also maintains that the defendants' unlawful combination constitutes a conspiracy "to boycott St. Joseph's in per

---

**6.** The above-mentioned January, 1984 "misrepresentation letter from MMC to the SHPA is cited as another example of MMC's bad faith activities. Other examples are described in the complaint at ¶¶ 37–38. St. Joseph's also alludes to other bad faith, conspiratorial actions which have been "concealed" and which it intends to prove at trial. *Id.,* at ¶ 39. Plaintiff concludes that all of the defendants' actions were designed to protect MMC from the threat of competition in the medical care market. *Id.,* at ¶ 40. These actions, according to plaintiff, have been effective in restraining competition in the health care market. *Id.,* at ¶¶ 41–42.

**820**

se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1", *Id.,* Count II, ¶ 53.

In Count Three plaintiff alleges that the defendants conspired "to monopolize the various markets for medical-surgical hospital services and cardiac surgery services in the relevant geographic markets ... in violation of" 15 U.S.C. § 2. Complaint at Count Three, ¶ 55. Finally, plaintiff asserts that it has sustained considerable damages as a result of defendants' actions. *Id.,* at ¶¶ 43–48.

## II. *Conclusion*

### A. *Motions to Dismiss*

Before this Court can dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), it must conclude that the plaintiff can prove no set of facts in support of the claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Friedlander v. Nims,* 755 F.2d 810, 813 (11th Cir.1985); *Stone Mountain Game Ranch, Inc. v. Hunt,* 746 F.2d 761, 763 n. 4 (11th Cir.1984); *see also Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1104 (D.C.Cir.1985) ("it need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted") (emphasis original). All of the well-pleaded allegations of the complaint are thus treated as true. *Gibson; Hardwick v. Bowers,* 760 F.2d 1202, 1205 n. 4 (11th Cir.1985).

However, "[c]onclusory allegations 'will not survive a motion to dismiss if not supported by the facts constituting a legitimate claim for relief.'" *Lombards, Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir.1985) ("A conclusory allegation to restrain trade will not survive a motion to dismiss"), quoting *Quality Foods v. Latin American Agribusiness Development Corp.,* 711 F.2d 989, 995 (11th Cir.1983). Nor is a court required to accept a party's *legal* conclusions. *Solis Ramirez v. United States Dept. of Justice,* 758 F.2d 1426, 1429 (11th Cir.1985).

Additionally, matters outside of the pleadings cannot be considered on a motion to dismiss under Rule 12(b)(6), *Chandler v. Coughlin,* 763 F.2d 110, 113 (2nd Cir.1985); *Tele-Communications of Key West v. United States,* 757 F.2d 1330, 1335 (D.C.Cir.1985); *Finn v. Gunter,* 722 F.2d 711, 713 (11th Cir.1984) (Where both parties attached exhibits to the 12(b)(6) motion and response and court considered same, motion to dismiss was converted to motion for summary judgment, necessitating all relevant procedural safeguards), although the mere presence of such matters does not affect a Fed.R.Civ.P. Rule 12 dismissal where a court clearly rules *only* on the motion to dismiss. *E.E.O.C. v. Reno,* 758 F.2d 581, 583 n. 6 (11th Cir.1985). Further, a motion to dismiss for failure to state a claim is not converted to a motion for summary judgment where matter considered by the Court is attached to complaint, since under Fed.R.Civ.P. 10(c) such attachment is considered as part pleadings for Rule 12(b)(6) purposes. *Soliz-Ramirez, supra,* 758 F.2d at 1430; *see also What, Other Than Affidavits, Constitutes 'Matters Outside the Pleadings,' Which May Convert Motion Under [FRCP] 12(b), (c), Into Motion for Summary Judgment,* 2 ALR Fed. 1027 (1969).

Nor is a 12(b)(6) motion so converted when copies of court opinions are submitted with a 12(b)(6) motion. *Nix v. Fulton Lodge International Assoc. of Machinists and Aerospace Workers,* 452 F.2d 794 (5th Cir.), *cert. denied,* 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972). *Compare Tenneco Oil Co. v. Dept. of Energy,* 475 F.Supp. 299 (D.Del.1979) (Motion to strike five counts of complaint was converted to motion for partial summary judgment where it was necessary for court to consider administrative record, which constituted matters outside of pleadings); *see also Smith v. Sheet Metal Workers Intern. Assoc.,* 500 F.2d 741, 744–45 (5th Cir.1974) (affidavits, oral argument and other extra pleading materials converting possible alternative 12(b)(6) motion into motion for summary judgment); 5 Wright & Miller, Federal Practice and Procedure: Civil

¶ 1366 at 682 & n. 71 (1969 & 1985 supp.), citing *United Steelworkers of American, AFL–CIO v. American Int'l. Aluminum Corp.*, 334 F.2d 147, 149 (5th Cir.), *cert. denied*, 379 U.S. 991, 85 S.Ct. 702, 13 L.Ed.2d 611 (1964) (Brief supporting motion to dismiss, which included considerable factual material, including the charge, complaint and answer before the Labor Board, triggered conversion of dismissal motion to one for summary judgment) and quoted in *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir.1982) ("Memoranda of points and authorities as well as briefs and oral arguments, however, are not considered matters outside the pleadings for purposes of conversion").

### B. *Noerr-Pennington Immunity*

Although the parties appear to agree that the defendants' alleged antitrust activities, if proven, would "have a substantial effect on interstate commerce[,]" 24 Fed. Proc.L.Ed. § 54:102 (1984); *see also id.*, § 54:103 (jurisdictional requirements); *Shahawy v. Harrison*, 755 F.2d 1432, 1436 (11th Cir.1985); *Marrese v. Interqual, Inc.*, 748 F.2d 373 (7th Cir.1984); Complaint at 5–7, ¶¶ 12–14, 18–19, the defendants argue that plaintiff states no claim because the defendants are immune from antitrust liability under the doctrine formulated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (publicity campaign by railroad companies designed to obtain legislation adverse to trucking industry held protected under First Amendment right of access to government) (hereinafter, *"Noerr-Pennington* doctrine").

■ The *Noerr-Pennington* doctrine protects the rights of freedom of expression and resort to governmental process. This "[petitioning] immunity extends to attempts to influence judicial and administrative actions since the 'right to petition extends to all departments of the Government.' *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 [cits] (1972)." *Mid-Texas Communications v. A.T. & T. Co.*, 615 F.2d 1372, 1382 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). The immunity is lost when legal processes are abused for the predominant purpose of furthering anticompetitive intent. *Ottensmeyer v. Chesapeake & Potomac Telephone Co.*, 756 F.2d 986, 993 (4th Cir.1985). This loss of *Noerr-Pennington* immunity is known as the "sham exception."

■ Stated differently, when a business competitor files "sham" complaints with a government agency or otherwise saddles a competitor or potential competitor with the actual or threatened burden of responding to bad-faith initiations of governmental action, such action may be found to support an exception to petitioning immunity. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 379–80, 93 S.Ct. 1022, 1030–31, 35 L.Ed.2d 359 (1972), *on remand, United States v. Otter Tail Power Company*, 360 F.Supp. 451 (D.Minn. 1973), *aff'd, Otter Tail Power Co. v. United States*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). While *Noerr-Pennington* immunity prevents the imposition of antitrust liability on companies which merely petition or otherwise legitimately exploit government decision-making bodies, the "sham" exception precludes a party's use of legislative and adjudicative process as a mere cover for "interfer[ing] directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533. That is, it "prevents a party from misusing governmental processes by employing means that achieve 'substantive evils.' *California Motor, supra*, 404 U.S. at 513–16, 92 S.Ct. at 613–14 [cits]." *Mid-Texas Communications*, 615 F.2d at 1384. The exception does *not* prevent " '[j]oint efforts to influence public officials ... even though [such efforts] *are intended to eliminate competition.* Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.' [*Pennington,*] 381 U.S. at

670 [85 S.Ct. at 1593 [cits]." *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1363 (5th Cir.1983) (emphasis added); *Semke v. Enid Auto Dealers Assoc.,* 456 F.2d 1361 (10th Cir.1972) (Defendant auto dealers, who successfully persuaded State Motor Vehicle Commission to obtain an injunction against plaintiff from selling new cars without a license, were immune under *Noerr-Pennington* doctrine from antitrust liability).

■ Finally, the sham exception is to be read narrowly in order to protect the First Amendment right of access to administrative proceedings. *Razorback Ready Mix Concrete Co., Inc. v. Weaver,* 761 F.2d 484 (8th Cir.1985); *Mid-Texas Communications,* 615 F.2d at 1384; *Energy Conservation Inc. v. Heliodyne, Inc.,* 698 F.2d 386, 389 (9th Cir.1983); *see also Noerr-Pennington—Sham Exception,* 71 ALR Red 723 § 3 (1985). This must be done even though "[t]he standard [itself] for determining when a suit is a sham, taking it outside of *Noerr-Pennington* immunity, is not well defined." *Omni Resource Development Corp. v. Conoco, Inc.,* 739 F.2d 1412, 1413 (9th Cir.1984); *see also Greenwood Utilities v. Mississippi Power Co.,* 751 F.2d 1484, 1498 (5th Cir.1985); *Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. 951, 956 (D.Conn.1977); *Sage Intern., Ltd. v. Cadillac Gage Co.,* 507 F.Supp. 939 (E.D.Mich.1981) (formulating the standard to require a plaintiff to allege that the defendant initiated a baseless state court action fraught with defendant misconduct and aimed solely at directly impinging on plaintiff's ability to compete).

In light of these general principles, the Court will now examine plaintiff's allega-

tions concerning the litigation surrounding St. Joseph's CON application.

### C. *MMC's Representations to the SHPA*

As noted in the text accompanying note 6, *supra,* plaintiff points to a variety of conduct by defendants which, according to plaintiff, constitutes the "bad faith" litigation necessary to support the sham exception. Argument centers on MMC's letters and oral communications to the SHPA and the alleged misrepresentations contained therein. Plaintiff alleges that in a January 4, 1984 letter (Complaint, exhibit "A"), MMC deliberately misrepresented its health care capacities to the SHPA in a successful effort to precipitate an SHPA decision adverse to plaintiff.[7] In its March 12, 1984 letter (not identified in plaintiff's complaint but made exhibit "A" to its First Response Brief), MMC "misrepresented not only Memorial's capacity to perform cardiac surgery but also other questions such as amounts of indigent care provided." Plaintiff's First Response Brief at 7. The Court notes in passing that because the March 12th letter was neither identified in nor appended to the complaint, it is questionable whether it is "extra-pleading" material, although it does appear to be an item appearing in the administrative record. *See Parr v. Great Lakes Express Company,* 484 F.2d 767, 773 n. 5 (7th Cir.1973), citing 5 Wright & Miller, *supra,* § 1357, at 593. Nevertheless, it is largely cumulative of the earlier January letter and, for present purposes, it need not be considered.

■ Defendants deny that MMC made misrepresentations to the SHPA. Acknowledging, however, that this Court

7. Although not alleged in its complaint, plaintiff further specifies in a response brief that in this letter MMC deliberately inflated its capacity for performing cardiac surgery procedures so that SHPA would conclude that plaintiff's proposed services would unjustifiably duplicate same. Plaintiff's First Response Brief at 7. In its Supplemental Response Brief at 3, n. 1, plaintiff asserts that "SHPA accepted at face value

[MMC's] representation that it had capacity to perform 1560 cardiac surgery procedures a year. Yet at the court-ordered appellate hearing before the [Review Board, MMC's] own expert witness could only support a capacity ... of less than half the 1560 number. *See* Transcript of Hearing at pp. 1180–81." Because of the reasoning below, it is not necessary for the Court to

must take plaintiff's allegations to be true,[8] defendants maintain that plaintiff's CON application was denied primarily because of the New Rule and not statistics MMC supplied in that letter. They further contend that plaintiff has alleged only a pattern of *successful,* as opposed to baseless, litigational activities by MMC. In addition, since plaintiff was not barred from the proceedings, and thus was not rendered incapable of rebutting MMC's data, no "sham exception" would be warranted.

■ One clear concept emerges from the conflicting currents of case law in this area: The alleged sham activities must be examined as a whole to determine whether a defendant's conduct amounts to a "genuine effort[ ] to induce [the] government to take ... lawful action...." *Metro Cable Co. v. CATV of Rockford, Ind.,* 516 F.2d 220, 224 (7th Cir.1975), *or* whether that conduct was little more than an overall plan to interfere with the complaining party's business interests. Thus, even were there shown but one baseless action before

a state tribunal and that that alone would not justify invocation of the sham exception, the circumstances surrounding a defendant's conduct at and around that tribunal may be found to supply the answers to those "questions of motive and subjective intent." *Greenwood Utilities, supra,* 751 F.2d at 1498 n. 9; *Omni Resource, supra.*

■ It follows that there is no threshold requirement that a pattern of baseless activities, as opposed to more singular instances of misconduct, be demonstrated by a party seeking to strip away another's petitioning immunity. In *Trucking Unlimited,* for example, the plaintiff pleaded a pattern of baseless, repetitive claims. That case, however, should not be read for the proposition that such a pattern is a threshold pleading requirement. The *Trucking Unlimited* Court itself stated that "[t]here are *many other forms* of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations." 404 U.S. at 513 (emphasis added); *see also*

rely on this information in disposing of the instant motions.

8. MMC maintains that plaintiff's "misrepresentation" pleading fails to satisfy the requirements of Fed.R.Civ.P. 9(b). This is not a fraud case. Plaintiff only alleges misrepresentation as part of its "sham exception" pleading burden, not to recover on a fraud claim. Furthermore, even were Rule 9(b) read to apply to plaintiff's pleading burden, it is significant that "it must not be read to abrogate rule 8, ... and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broad policy of notice pleading." *Nims, supra,* 755 F.2d at 813 n. 3; *see also Reconsidering Federal Civil Rule 9(b),* 104 F.R.D. 143, 177– 80 (1985). The "clear intent [of Rule 9(b)] is to eliminate fraud actions in which all the facts are learned through discovery *after* the complaint is filed." *Nims,* at 813 n. 3. (emphasis added). In the instant case, the misrepresentations are alleged to already have been learned, and they are pleaded in reference to MMC's letter to the SHPA. Defendants have not demonstrated that the complaint itself was intended merely to serve as a device to unearth *possible* misrepresentations.

Further, the Court sees little reason to deviate from the standard of Rule 8, which does not require a detailed statement of facts, but only "a

short and plain statement of the claim showing that the pleader is entitled to relief...." However, it cannot be overlooked that conclusory statements of sham conduct can supply relative ease in the composition of an antitrust complaint against a competitor, especially in the aftermath of a competitor's appearance before a state agency. In so doing, a plaintiff can both chill a competitor's First Amendment rights and inject irony into the invocation of the sham exception. *See Bethlehem Plaza v. Campbell,* 403 F.Supp. 966 (E.D.Pa.1975). It is in that context that this Court harbors no objection to making short shrift of conclusory allegations, especially those of sham conduct. Moreover, in view of the Court's obligation to strictly construe the sham exception, *Mid-Texas Communications, supra,* Rule 8 in this context is not offended by requiring plaintiff to make allegations containing clearly stated explanations of *what* the defendants did and *how* those actions produced an abusive effect on the government machinery in question. *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1177 n. 8 (10th Cir.1982); *Spanish Intern. Communications Corp. v. Leibowitz,* 608 F.Supp. 178 (S.D.Fla. 1985); *Caplan v. American Baby, Inc.,* 582 F.Supp. 869, 871 (S.D.N.Y.1984); *see also City of Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1266–67 (S.D.Fla.1980): P. Areeda, *Antitrust Law,* § 203.4b (1982 Supp.); 24 Fed.Proc., L.Ed. §§ 54:236, 242 (1984).

*Colorado Petroleum Marketing Ass'n. v. Southland Corp.*, 476 F.Supp. 373, 378 (D.Colo.1979) (The *Trucking Unlimited* Court did not "intend[ ] to give every dog one free bite, thus making it an irrebuttable presumption that the first lawsuit was not a sham regardless of overwhelming evidence indicating otherwise."), citing *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 636 n. 6, 97 S.Ct. 2881, 2889 n. 6, 53 L.Ed.2d 1009 (1977) (plurality dicta suggesting that the sham litigation exception can be applied to a single lawsuit case); *id.*, at 662, 97 S.Ct. at 2903 ("Manifestly, when Mr. Douglas wrote for the Court in [*Trucking Unlimited* ] and described 'a pattern of baseless, repetitive claims' *id.*, 404 U.S. at 513, 92 S.Ct. at 613 [cits], as an illustration of an antitrust violation, he did not thereby circumscribe the category to that one example.") (Stevens, J. dissenting); *Aydin Crop. v. Local Corp.*, 718 F.2d 897, 903 (9th Cir.1983) ("Multiple lawsuits are not a condition precedent to showing a sham."); *Energy Conservation Inc. v. Heliodyne, Inc.*, 698 F.2d 386, 388–89 (9th Cir.1983); *Clipper Express v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1256 (9th Cir.1982); *Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530, 543 n. 6 (5th Cir.1978).[9]

Put another way, single or multiple baseless lawsuits, access-barring activity and other actions abusive of government decision-making processes, *see, e.g., Affiliated Capitol Corp. v. City of Houston*, 735 F.2d 1555, 1567–68 (5th Cir.1984) (en banc), *app. for cert pending*, —— U.S. ——, 105 S.Ct. 1164, 84 L.Ed.2d 316 (1985), are all individ-

ually *probative*, but not necessarily *dispositive*, factors for a court to consider in relation to the sham exception. *See also Winterland Concessions Co. v. Trela*, 735 F.2d 257, 263–264 (7th Cir.1984).

In the instant case, therefore, plaintiff's factual allegations (but not its conclusions), once taken as true, must be assessed within the totality of the circumstances in order for this Court to conclude whether the sham exception can be applied to defendants' petitioning immunity. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 835 n. 2 (9th Cir.1980), citing *Maple Flooring Mfrs. Ass'n. v. United States*, 268 U.S. 563, 583, 45 S.Ct. 578, 585, 69 L.Ed. 1093 (1925); *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir.1978). In so doing, the Court must first decide whether these particular misrepresentations, standing alone, are enough to justify application of the sham exception.

 In *Omni Resource, supra,* plaintiff alleged that the defendant had filed false affidavits and other documents in state court trespass proceedings as part of an effort to prevent plaintiff from mining land under unpatented lode claims. The Ninth Circuit was unimpressed. That such falsehoods were allegedly employed

is a charge that can easily be leveled, and it is thus insufficient by itself to overcome *Noerr-Pennington* immunity. *See Ernest W. Hahn, Inc. v. Coddling [Codding]* 615 F.2d 830, 835 n. 3 (9th Cir.1980); *Franchise Realty [Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers],*

9. This is not to suggest that the mere showing of a single, meritless lawsuit will suffice for sham exception purposes. Indeed, "[t]he right to pursue a claim in a state court action would be unduly impaired if the state court plaintiff had to be subjected to protracted pre-trial discovery and perhaps even trial in an antitrust suit [or counterclaim] before the antitrust immunity of his state court suit was established." *Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. 951, 956 (D.Conn.1977). On the other hand, a large company can deliver a financial "knock-out punch" to a fledgling competitor by bringing one single but baseless and expensive action against it. *See National Cash Register Corp. v. Arnett,* 554 F.Supp. 1176, 1178 (D.Colo.

1983). Each case, therefore, must turn on its own facts and circumstances. *See, e.g., Omni Resource, supra,* 739 F.2d at 1414 ("When the antitrust plaintiff challenges one suit and not a pattern, a finding of sham requires not only that the suit is baseless, but also that it has other characteristics of grave abuse, such as being coupled with actions or effects external to the suit that are themselves anti-competitive."); *see also Hydro-Tech, supra,* 673 F.2d at 1177 (Mere filing of a lawsuit without probable cause is not enough to support sham exception; "[a] sham action is one which tends to be abusive of the judicial processes and, therefore, is something more than an action instituted without probable cause.").

542 F.2d [1076,] 1082–83; *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1177 n. 8 (10th Cir.1982). A party should not as a matter of course have the accuracy of its testimony in a prior judicial proceeding subject to subsequent and collateral attack in the form of an antitrust suit.

739 F.2d at 1414.[10]

Significantly, the plaintiff in *Omni Resource* failed to allege "misrepresentation plus." That is, the plaintiff alleged *only* that the defendant filed false affidavits in a single state court lawsuit. Plaintiff did not allege that a governmental process was wholly subverted by the false affidavits. *See also Manego v. Orleans Bd. of Trade*, 598 F.Supp. 231, 237–39 (D.Mass.1984).

In *contrast* to *Omni Resource,* a governmental process was subverted in *Woods Exploration & Pro. Co. v. Aluminum Co. of Amer.*, 438 F.2d 1286, 1296 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). In that case, plaintiff alleged that two large tract natural gas producers committed antitrust violations by filing false nomination (production) forecasts with a state commission which regulated gas production from each tract. The false information allegedly was filed in order to secure reduced production allowance orders from the state commission, thereby harming small-tract producers. This conduct exceeded mere attempts to influence governmental policy, which is all the *Noerr-Pennington* rule was designed to protect. Instead, the misrepresentations were claimed to have subverted the state commission's decision-making process.

The *Woods* court, in distinguishing *Okefenokee Rural Elec. Membership Corp. v. Florida Power & Light Co.*, 214 F.2d 413 (5th Cir.1954) emphasized the difference between misrepresentations relied upon by the adjudicative body and readily verifiable misstatements.

**10.** Relatedly, mere factual exaggerations that normally accompany zealous advocacy in a legal process should not ordinarily be elevated to "sham misrepresentation" where it is not alleged that they in some way figured into a gross abuse of, as opposed to a mere drag on, the governmental process in question. To permit otherwise would enable antitrust litigants to "overcome the doctrine that litigation, as a general rule, is protected by the First Amendment and is thus immune from antitrust challenge." *Omni Resource,* 739 F.2d at 1413. Remedies for bad faith misrepresentations and meritless litigation before courts already exist in a variety of contexts within both federal and state court systems. *See, e.g., Lipsig v. National Student Mktg. Corp.,* 663 F.2d 178, 181 (D.C.Cir.1980) (parties sanctioned for misleading the court by misquoting or omitting material portions of documentary evidence); Fed.R.Civ.P. 11; *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181 (1985); *see also In re Beard,* 742 F.2d 1465 (11th Cir.1984) (unpublished decision) (Affirming this Court's Order suspending from practice before this Court an attorney who made unfounded allegations and factual misrepresentations over the course of various lawsuits); *Alyeska Pipeline Services Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Beard v. Annis,* 730 F.2d 741 (11th Cir.1984) (attorney's fees awarded under 42 U.S.C. § 1988 to defendant against plaintiff for bringing a frivolous, baseless lawsuit); *Hubby v. Historic Savannah*

*Foundation,* 623 F.Supp. 637 (S.D.Ga.1985) (Granting civil rights defendants' motion for $34,627.34 in attorney's fees and costs against *pro se* plaintiff for maintaining frivolous litigation); *Van Berkel v. Fox Farm & Road Machinery,* 581 F.Supp. 1248 (D.Minn.1984) (Fed.R. Civ.P. 11 sanction imposed on plaintiff's attorney for failure to make reasonable inquiry regarding statute of limitations period before filing products liability action); *accord, Wells v. Oppenheimer & Co.,* 101 F.R.D. 358 (S.D.N.Y. 1984); 28 U.S.C. § 1927; *Karsman v. Portman,* 173 Ga.App. 108, 325 S.E.2d 608 (1984); *Florida Rock Industries, Inc. v. Smith,* 163 Ga.App. 361, 294 S.E.2d 553 (1982); 72 ALR Fed 724 (1985).

Of course, this does not mean that misrepresentations which are so abusive that they subvert administrative, adjudicative and other judicial decision-making processes cannot be used to support a federal antitrust claim simply because other remedies exist to address the misrepresentations. *Woods Exploration & Pro. Co. v. Aluminum Co. of Amer.,* 438 F.2d 1286, 1296 (5th Cir.1971). Misrepresentations within the judicial process are more significant than in the political process, as judicial/adjudicative bodies often must rely on a party's representations, *Woods,* while political bodies by nature are better equipped to tolerate impurities. The *Trucking Unlimited* Court made it clear that activity which is acceptable in the political arena does not necessarily retain its *Noerr-Pennington* immunity when it is used in the judicial process. 404 U.S. at 513, 92 S.Ct. at 613.

[I]n *Okefenokee,* [the] defendants presented misleading arguments, [but] the pleadings did not allege falsification of facts. Further, the misstatements that were made *were readily verifiable.* Consequently, there was no allegation that the governing authority's decision [favorable to defendants] ... was premised upon false information.

438 F.2d at 1295 (emphasis added).

In contrast, the State Commission in *Woods* allegedly based its production orders

upon false facts adduced by defendants. There was, moreover, no opportunity for meaningful verification. Because of the amount and character of nomination [production] predictions, the ... Commission of necessity must rely on the truthfulness of the gas producers. Such facts are usually in the exclusive control of those producers, so the final order of the Commission often must accept the nomination at face value. Hence, defendant's conduct here can in no way be said to have merged with the action of the state since the Commission neither was the real decision maker nor would have intended its order to be based on false facts.

438 F.2d at 1295.[11]

From the above discussion it is clear that there are instances where a single instance of misrepresentation can form the foundation for the sham exception. *Woods; Walker Process Equipment v. Food Machinery Corp.,* 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965) (Re-

covery upon proper showing is available under § 2 of Sherman Act for fraudulent procurement of a patent). However, and as mentioned above, it must be properly alleged that defendants, through such misrepresentation(s) "subverted the integrity of the governmental process." *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n.,* 663 F.2d 253, 262–63 (D.C.Cir.), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1981). Often something more than a single misrepresentation (*i.e.,* "misrepresentation plus") is alleged in sham exception cases. *See, e.g., Transkentucky Transp. v. L & N.R. Co.,* 581 F.Supp. 759, 768–71 (E.D.Kentucky 1983) (Application of sham exception supported by allegations of intentional submission of false and misleading evidence to state adjudicatory body, *plus* frivolous appeal of that body's order, obstention of meritless restraining order, submission of false information to state appellate court, frivolous petition for reconsideration, and subsequent initiation of sham proceeding with federal adjudicatory body); *see also* P. Areeda, *Antitrust Law* § 203 at 41–42, n. 7 (1978) (pattern of baseless litigation not an absolute prerequisite, "although repetitive actions would often be necessary to prove bad faith.").

▮ While the number of misrepresentations is not insignificant, the overall focus of sham exception analysis must be directed to the manner in which the alleged misrepresentations abused and subverted the governmental process.[12] In *Woods,*

---

**11.** It is true that the *Woods* Court at this point was addressing the defendants' argument that since their production forecasts became a part of the commission's final production orders, plaintiff's alleged injury was solely the result of state action, which itself was exempt from the Sherman Act under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1947). 438 F.2d at 1293. However, the *Woods* Court further found *"Noerr-Pennington* [immunity] inapplicable to the alleged filing of false [information] ... by defendants because this conduct was not action designed to influence policy...." 438 F.2d at 1298; *see also Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272, 275–79 (D.C.Cir.1972). Furthermore, this Court finds such reasoning to

be particularly useful in analyzing the instant case.

**12.** This may be achieved in a variety of ways, and indeed, it may be done constructively. In many instances a wrongfully obtained adverse decision basically puts the losing party in the same position as in the case where that party has been effectively barred from access to the decision-making body. In this sense, it may be said that actions *designed* to bar a competitor's access to government decision-making machinery achieve the same (anticompetitive) *result* as the corruption/usurpation of that machinery by misrepresentations, bribery, or other abusive conduct. *See Trucking Unlimited, supra,* 404

one false presentation was enough to subvert the process. *See, id.*, 438 F.2d at 1295 ("the Commission neither was the real decision maker nor would have intended its order to be based on false facts."); *see also Walker, supra; cf., Charles Pfizer & Co. v. F.T.C.*, 401 F.2d 574 (6th Cir.1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969) (patent obtained by intentional and material misrepresentation to patent office). In some cases the sheer number of instances of bad faith conduct permits a court to infer, for summary disposition purposes, the probable existence of sham exception evidence.[13]

The difficulty in evaluating the alleged facts in this case illustrates that under the totality of the circumstances, both the *design* of the alleged abusive conduct *and* its probable *result, see* note 12, *supra*, must be gauged in deciding this issue. Evaluating design without assessing its intended probable result would result in a flawed analysis because the Court would risk overemphasizing unethical conduct without evaluating its reasonably probable result. It is possible to file a meritless lawsuit and make misrepresentations without intending antitrust-oriented abuse as a result. The *Omni Resource* Court accepted as true plaintiff's allegation that the defendant in that case submitted false affidavits in state court, but refused to apply the sham exception. No "misrepresentation plus" result was alleged in that case. One may make misrepresentations part of one's litigational *design*, but if the reasonably probable *result* of such conduct is not process-subvert-

ing, "sham-exception" abuse, then an *Omni Resource* ruling, rather than a *Woods* ruling, would be warranted. This design and probable (or actual) result analytical model can be seen at work in *Trucking Unlimited, Woods, Transkentucky,* and *MCI v. ATT & T, supra.* It shall be applied here.

■ Although the Court disagrees with defendants that the mere showing that plaintiff was not barred from the agency process is dispositive, this fact is significant in assessing the totality of the circumstances in this case. That plaintiff was not so barred is supported by both the allegations in the complaint and common sense.[14] As mentioned above, the complaint fails to allege that the alleged misrepresentation was not disputable by plaintiff. *See Wheeling Pittsburgh v. Allied Tube & Conduit*, 573 F.Supp. 833, 843 (N.D.Ill. 1983); *compare Woods, supra.*

■ Nevertheless, even assuming that the alleged misrepresentations were submitted without a meaningful opportunity for plaintiff to respond, there is no allegation that the SHPA itself was so objectively underequipped that MMC knew or should have known that its alleged statistical misrepresentation would be blindly accepted, producing a wholly *subverted, corrupted* (as opposed to merely erroneous) decision. By *design*, the defendants may have intended to embellish on MMC's image and persuade the state tribunal that MMC is all that the regional populace

U.S. at 511, 92 S.Ct. at 612 (defendants' opposition to the plaintiffs' every application before the state commissions, regardless of merit, effectively closed the machinery of the agencies to the plaintiffs); *Metro Cable Co., supra,* 516 F.2d at 232; *Racetrac Petroleum, Inc. v. Prince George's County,* 601 F.Supp. 892, 912 (D.Md. 1985) (No access-barring or abuse-of-governmental-process conduct shown). At all times both the design and the result revolve around the *abuse* of a governmental process.

13. There was no need for the *Transkentucky* court to reach the issue of what minimum quantity of false submissions is necessary to support the sham exception, as the particular misrepresentations, combined with the alleged pattern of

other abusive conduct (*i.e.,* the repetitive, baseless litigation), were enough to justify invocation of the sham exception. Whatever is the minimum quantity of fraudulent misconduct, the alleged instances surpassed that in the *Transkentucky* complaint.

14. As the *Outboard Marine* court recognized, "the administrative law applicable to the proceeding involved is a question of law, inquiry into which could be made on a motion to dismiss...." 474 F.Supp. at 178 n. 17. O.C.G.A. § 31–6–43(e) specifies that "[a]ny interested person may submit information to the [SHPA] concerning an application, and an applicant shall be entitled to notice of and to respond to any such submission."

needs in terms of cardiac services. Unlike the situation in *Woods,* however, plaintiff has failed to plead facts showing that the SHPA was blindsided by the alleged misrepresentation and thus had "no opportunity for meaningful verification." *Woods,* 428 F.2d at 1295. Nor, that the state agencies "of necessity [had to] rely on the truthfulness of the [defendants' data and] forecasts[,]" because "[s]uch facts ... [were] in the exclusive control of those [defendants] so [that] the final order of the [tribunals] ... must [have] accept[ed] the [defendants' data] at face value." *Id.*

In short, plaintiff has failed to allege that the SHPA was "neither ... the real decision maker nor would have intended [its decisions] to be based on false facts." *Id.* Nor that the reasonably probable *result* of the defendants design was a subversion of the regulatory process, thus robbing the state agency of its own independent basis for rendering its decisions. *Woods.* Indeed,

> [t]he fact that opposition is strongly voiced in an administrative hearing carries in and of itself no implication of an intent to interfere with the competitor's business relations, *even if the opposition contains misstatements of fact or incompletely researched or unjustified conclusions.* There must be some clearly established pattern of misrepresentation, or of ... tactics *designed to deprive the administrative body of its ability to function independently* before [the sham exception] can be invoked.

*Rush-Hampton Industries v. Home Ventilating Inst.,* 419 F.Supp. 19, 24 (M.D.Fla. 1976) (emphasis added); *see also Razorback, supra,* 761 F.2d at 487 (plaintiff must allege "*serious* misconduct similar to the access-barring abuses described in *California Motor.*").[15] No such pattern or tactics

---

**15.** Although it is not necessary to base the instant ruling on the procedural structure of the SHPA proceedings, it cannot be overlooked that the legislative scheme behind the SHPA invites comment by "interested parties" and invests the SHPA with rulemaking powers, *see* O.C.G.A. § 31–6–21(b)(4) (Michie, 1984); *see also* O.C.G.A. § 31–6–43 (Michie, 1982); *St. Joseph's I, supra.* Both the allegations and the exhibits to the complaint indicate that such powers were used in this case, thus revealing a quasi-legislative element in the proceedings.

In addition, a major focus of the SHPA's duties was in large part on resource allocation (*i.e.,* assessing area medical needs in light of the government policy of hospital cost containment in reference to avoiding costly duplication of services). Consequently, complaint exhibit "B" itself indicates that the SHPA proceeding was not purely "adjudicatory," focusing only on the resolution of rights between the two sides and exclusively on information supplied by those sides, but instead contained a legislative (the "New Rule") element resulting in a governmental policy decision involving the allocation of resources in the Georgia. It is in these circumstances that the special concerns over "the integrity of the regulatory process" *Israel v. Baxter Laboratories, supra,* 466 F.2d at 278, may not be as heightened and greater adversarial "breathing space" is warranted.

While the SHPA cannot be precisely equated with the agency in *Franchise Realty, supra,* 542 F.2d 1076 (Dismissal is more readily granted where the alleged sham activity occurs before a non-adjudicatory body because the grant of petitioning immunity is more broadly construed in

political settings), nevertheless, the thread of reasoning contained in that case is useful here. *See also* P. Areeda, *Antitrust Law,* § 204c at 45–49 (1978); *id.,* § 204.1c at 29 (1982 Supp) (Imposing antitrust "[l]iability [for mispresentations] would be least justified where the governmental body is legislative (where almost 'anything goes') or where the proceedings are adversary *or the agency is expert or investigative* (where statements are challenged).") *id.,* § 204.1d at 30 & n. 10 (emphasis added), citing *Rush Hampton, supra.*

So viewed, *Outboard Marine Corp. v. Pezetel,* 474 F.Supp. 168 (D.Del.1979), provides a useful comparison. In that case a Polish golf car manufacturer and its domestic distributor alleged in an antitrust suit counterclaim that a former domestic manufacturer combined with others to submit knowingly false information to federal agencies. They further alleged that the false information submitted to Treasury Department and Customs Service resulted in the imposition of dumping duties against them. As this Court holds in this case, the *Outboard Marine* court held that the fact that the defendants were not barred from the proceedings as a result of plaintiff's conduct did not vitiate the antitrust "sham exception" claim. 474 F.Supp. at 176. More importantly, however, there was no suggestion that the governmental agencies were engaging in anything more than application of regulations to the submitted data. That is, they were not engaged in rulemaking which following a public notice and comment period, as apparently occurred in the instant case. *Outboard Marine* therefore was closer to *Woods* and *Israel,*

"designed to deprive the administrative body of its ability to function independently" has been alleged here.

Furthermore, even were it alleged and proven that plaintiff was unable to respond to MMC's data before the SHPA and that the SHPA was "blindsided" by the alleged misrepresentations,[16] no "sham abuse" finding would be warranted in light of the fact that a two-stage administrative procedure existed here, in contrast to the one-stage procedure found in *Woods*, and no facts are pleaded which indicate that the second (Review Board) stage of the procedure in this case was subverted by the alleged misrepresentations.[17] To the contrary, the Review Board declined to reach the merits-component of the appeal in light of the New Rule and later ruled in *plaintiff's favor* when it did reach the merits component.

Thus, even were the above-mentioned missing elements pleaded in this case, it cannot be said, once such allegations were taken as true, that the administrative process as a whole was subverted within the meaning of *Woods* and that support would exist for invocation of the sham exception to defendants' *Noerr-Pennington* immunity.

Finally, the "New Rule" justification in the SHPA's initial decision (Complaint Exh. B), and indeed, later in the Review Board's decision, provides an insurmountable causation problem for plaintiff. Thus, even were it alleged that the entire state agency exclusively relied on and was subverted by MMC's alleged misrepresentations, unlike the circumstances found in *Outboard Marine, supra,* 474 F.Supp. at 178, both the complaint and its exhibit B reveal, as plaintiff acknowledges, that the "New Rule" supplied the primary justification for the SHPA's CON ruling. *See WIXT Television, Inc. v. Meridith Corp.,* 506 F.Supp. 1003, 1033 (N.D.N.Y.1980); *see also* Areeda, *Antitrust Law,* § 204.1d (1982 Supp.). Although plaintiff can argue that it was compelled to continue litigating to reverse the alleged misrepresentation-based component of the SHPA's decision, *see id.,* at § 204.1e (1982 Supp.), continued litigation was necessary to reverse the "New Rule" component anyway.[18] In any event, it is doubtful that the litigational injury, if any, flowing from this one instance of misrepresentation, would rise to an antitrust claim. *Compare Litton Systems v. AT & T,* 487 F.Supp. 942 (S.D.N.Y.1980), *aff'd,* 700 F.2d

---

than to *Franchise Realty, supra.* In contrast, extra latitude would be warranted in the instant case, where the proceedings were public and the "New Rule," a legislative-type act formulated by the SHPA, served as the primary basis for denial of St. Joseph's CON application both at the SHPA and Review Board levels. *See* text accompanying notes 4 & 5, *supra.*

**16.** Defendants also argue that their initial success before the SHPA negates any inference of sham conduct. *See Leibowitz, supra,* 608 F.Supp. 178. Success or failure of a party's protests before the state agency is regarded as indicative, although not singularly determinative, of a party's intent within the meaning of sham exception analysis. *Clipper Express, supra,* 690 F.2d at 1254, citing *Hahn, supra,* 615 F.2d at 841 n. 13; *see also Mid-Texas Communications, supra,* 615 F.2d at 1383; *Taylor Drug Stores v. Associated Dry Goods,* 560 F.2d 211 (6th Cir.1977); Areeda, *Antitrust Law,* § 203.1d (1982 Supp.).

Although this Court agrees with that reasoning, it is to state the obvious however, that "success" achieved by corrupting the process producing such result is invalid. In the instant case, there is only a conclusory allegation that the process was corrupted, thus invalidating such success. The specific allegations necessary to support this allegation are, as detailed above, absent from the complaint. However, the fact that the defendants initially were successful on the alleged misrepresentation component of the SHPA's decision is only probative evidence of their "non-abuse" intent, not dispositive. Relatedly, the mere fact that the SHPA was later reversed, *St. Joseph's I,* is irrelevant. *See Greenwood Utilities, supra,* 751 F.2d at 1500.

**17.** As discussed in Part II, D, *infra,* the other alleged acts of the defendants in relation to the *Review Board's* activities do not rise to "sham exception" abuse. Also, plaintiff's own allegations make it clear that the injunctive relief requiring the Review Board to rule on the merits component of plaintiff's appeal from the SHPA was obtained in response to the Review Board's application of the New Rule and not the alleged misrepresentations.

**18.** Significantly, no sham conduct is alleged in relation to the State agency's adoption of the "New Rule."

785, 809–12 (2nd Cir.), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (Defendant's allegedly misleading tariffs filed for some *seven years* with federal and state agencies, thus delaying FCC's ultimate rejection of same, constituted an antitrust offense). Plaintiff may have suffered a temporary setback at the SHPA before obtaining a "merits" component reversal at the Review Board. As mentioned above, however, it is not necessary for this Court to decide whether this extra litigating expense supplies support for application of the sham exception because plaintiff fails to allege that it had no opportunity to dispute the defendants' data, that the SHPA was unable to verify same, that the agency process as a whole was subverted and that the same temporary setback would not have occurred but for the "New Rule" component of the SHPA's (and indeed, the Review Board's later) decision.[19]

Accordingly, plaintiff's "misrepresentation" allegations supply no support for invocation of the sham exception.

#### D. *Other Alleged Misconduct*

The Court now must evaluate the alleged misrepresentations in the context of other alleged "abusive acts" in order to determine whether plaintiff has alleged an abuse of governmental process sufficient to support invocation of the sham exception. However, in view of the fact that the complaint suffers from conclusory allegations in this area (*see, e.g.,* complaint at ¶¶ 37, 38, 40), it is worth reviewing the pleading standards in this context.

> Notice pleading is all that is required for a valid antitrust complaint. *Quality Foods v. Latin American Agribusiness Development Corp.,* 711 F.2d 989, 995 (11th Cir.1983). Under notice pleading

the complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rest[s].' *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [78 S.Ct. 99, 102, 2 L.Ed.2d 80] [cits] (1957). Nevertheless, 'enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified.' *Id.* Conclusory allegations 'will not survive a motion to dismiss if not supported by the facts constituting a legitimate claim or relief.' *Id.* See also *City of Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1263 (S.D.Fla.1980).

*Lombard's Inc. v. Prince Mfg. Co., supra,* 753 F.2d at 975; *see also* note 8, *supra.*

The remainder of the instant complaint is best analyzed by identifying what is not alleged. There is no allegation of collusion or conspiracy between defendants and members of the SHPA or Review Board. *See Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); 691 F.2d 678, 683 & 687 (4th Cir.1982) (evidence that antitrust defendants, with the aid of chairman of health planning council were able to dominate the council and subvert it to their own purposes would support application of the sham exception). Nor are there allegations of bribery or perjury or criminal acts in relation to defendants' involvement with these proceedings. *See Trucking Unlimited, supra,* 404 U.S. at 512–13, 92 S.Ct. at 612–13.

In fact, plaintiff makes no allegation that the actions taken at the post-SHPA levels of litigation were procured by the use of other instances of fraud, baseless as opposed to merely unsuccessful arguments, or other tactics revealing an abuse of governmental process. *Compare Landmarks Holding Corp. v. Bermant,* 664 F.2d 891

---

**19.** Although it is not necessary to support this Court's decision, the Court notes in passing plaintiff's letter brief of January 8, 1985, to which there is appended two State Superior decisions (*West Paces Ferry Hospital, Inc. v. SHPA,* C.A. D–7076 (Atlanta Jud.Cir.Sup.Ct. Aug. 22, 1984) and *Piedmont Hospital v. SHPA,* C.A. D–08463 (Atlanta Jud.Cir.Sup.Ct. July 20, 1984))

reversing the Review Board for its failure to consider the merits component of CON applications in light of the SHPA's cardiac rule (*i.e.,* the "New Rule."). These cases reinforce this Court's conclusion that the "New Rule" has vitiated whatever causation might be shown to exist between the alleged misrepresentations and plaintiff's alleged injuries.

(2nd Cir.1981) (majority opinion). The same may be said for the allegations concerning MNC's actions regarding the NME application. *See* Text, *supra,* at 7–8.

■ Stated differently, no grounds for the sham exception are supplied by the allegations in question, which themselves allege what is little more than a defendant's attempt to lawfully induce state administrative and judicial action favorable to itself and detrimental to a competitor. As in *Razorback,* 761 F.2d 484, *supra,* and *Central Bank of Clayton v. Clayton Bank,* 424 F.Supp. 163 (E.D.Mo.1976), *aff'd without op.,* 553 F.2d 102 (8th Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1976) (Inducing favorable governmental action, even for anticompetitive purposes, is not a violation of the antitrust law), the defendants' intervention and subsequent appeals in the state agencies and courts were authorized by both the Review Board and the state legislature. *See* notes 3 & 4, *supra; see also Mid-Texas Communications,* at 1383–84 (Regardless of any anticompetitive intent, telephone company had a right to contest the complaint filed by a prospective competitor with the FCC). There is no allegation that MMC was not legally authorized to urge the SHPA to move the Review Board to dismiss St. Joseph's appeal, especially where the basis for such encouragement was a new governmental policy (*i.e.,* the "New Rule") and irrespective of the fact that such policy worked to MMC's favor.

Thus, stripped of its conclusory terms, the complaint alleges only that the defendants lawfully used a process, accorded them by the legislature, to advocate, albeit perhaps cynically, a position espoused by state agency personnel and therefore *not* baseless. *See also In re Airport Car Rental Antitrust Litigation,* 521 F.Supp. 568, 589 (N.D.Cal.1981), *aff'd,* 693 F.2d 84 (8th Cir.1983) (No sham exception warranted where plaintiff offered no evidence beyond fact that antitrust defendants urged

airport to adopt qualifying fee for car rental companies and where defendants opposed plaintiff car rental company's application for space at airport on the ground that there was an insufficient business volume to support additional licensee).

The same conclusion arises from the fact that defendants moved to disqualify an official who happened to express views favorable to plaintiff but who nevertheless disclosed a possible conflict of interest. MMC's disqualification motion simply is *not* an abuse of the state's processes, especially where the agency in question *granted* the motion and plaintiff has alleged no other facts indicating that such result was perverted by abusive conduct and that abusive, as opposed to mere anticompetitive intent, could reasonably be inferred from this act.[20]

Likewise, there is no suggestion that once defendant MMC was permitted to intervene in the appeal from the SHPA to the Review Board (and no abusive conduct is alleged with regard to its intervention motion), MMC was not within its rights to move, two weeks later, for the disqualification and, in light of the "New Rule," for postponement of the merits portion of the appeal until the "New Rule" controversy was resolved. That defendants were successful on these motions further underscores the fact that plaintiff has failed to allege facts showing conduct exceeding lawful use of state-sanctioned procedures.

Further, as mentioned in note 18, *supra,* the fact that a state agency suffers a reversal of a position which a defendant happens to have urged supplies no grounds for the sham exception. The Fifth Circuit emphasized that

in the administrative context, an ultimate determination that state agency action sought was unauthorized by statute should not remove protection for petitioning conduct directed to the agency to obtain that action. Only where evidence shows that the defendant knew or should

---

**20.** The complaint itself acknowledges that this chairman informed the SHPA that he had represented plaintiff's insurance carrier in another legal context and offered the SHPA the opportunity to move to disqualify him. Complaint at 12, ¶ 35.

have known that the action he sought was improper would a court be justified in labeling his petitions a "sham" not entitled to *Noerr-Pennington* protection. *See generally* P. Areeda, *Antitrust Law,* ¶ 203.2 (1982 Supp.).

*Greenwood Utilities v. Mississippi Power Co., supra,* 751 F.2d at 1500. Plaintiff has made no *factual* allegation in its complaint indicating that there exists evidence showing that MMC knew its advocacy was so baseless that it should be characterized as a sham.

 Paragraph thirty-eight of the complaint alleges that

[t]he defendants' combination and conspiracy to carry out their bad faith scheme of misrepresentation and obstruction is intended and has had the effect of preventing St. Joseph's from establishing cardiac surgery services and of otherwise preserving and enhancing the defendants' market power over the provision of tertiary and medical-surgical hospital services in general and cardiac surgery services in particular. In addition to the deliberate course of misconduct alleged above, the defendants also have attempted to coerce and persuade physician members of medical staffs of St. Joseph's and Memorial who were scheduled to testify in support of St. Joseph's CON application at the appellate hearing to testify opposing the application.

Both sentences in this allegation are nothing more than "[c]onclusory allegations [which] 'will not survive a motion to dismiss [because they are] not supported by the facts constituting a legitimate claim

for relief.' " *Lombard's, supra,* at 975. The first sentence requires no further comment. The latter sentence fails to allege that the defendants attempted to or actually did elicit false or otherwise *perjurious* testimony before a state agency. As mentioned above, plaintiff must "make allegations containing clearly stated explanations of what the defendants did and how those actions abused the government machinery so as to rise to sham conduct." Note 8, *supra.*[21] No facts are pleaded indicating, for example, *when* such witnesses were "coerced" (defendants maintain that this complaint was filed before the date of the hearing to which plaintiff refers), much less *how* they were "persuaded." Sometimes employees or citizens are intimidated by the mere size and political/economic influence of an institution in the community, or professional orbit within which a witness travels. Sometimes witnesses can be directly contacted by agents of such institution and expressly threatened in an effort to suborn perjury. Sham abuse could not be found in the former example. The latter situation would involve facts to be pleaded in a sham abuse complaint. *See Garst v. Stocco,* 604 F.Supp. 326, 333 (E.D. Ark.1985). Plaintiff's allegation contains no such specification. As mentioned above, *see* note 8, *supra,* sufficient facts must be pleaded so that a defendant can be put on notice of what it allegedly did, especially where the pleadings are made in order to defeat a defendant's petitioning immunity.

Finally, the above alleged acts do not, when read in light of the alleged misrepresentations discussed in section IIc, *supra,* constitute "the threads from which a 'pattern of baseless, repetitive claims' can be woven...." *Landmarks Holding Corp.,*

---

**21.** Plaintiff's allegations concerning defendants' involvement in the previously described National Medical Enterprise CON proceedings are insufficient. First, no abuse of governmental process is alleged, only permissible conduct within the meaning of *Trucking Unlimited.* Second, no such abuse is pleaded in connection with the alleged abuse in the instant case. In fact, plaintiff's complaint alleges that MMC was *successful* in this endeavor (Complaint at 9, ¶ 22), and it does not allege that the success was the product of defendants' abuse of governmental machinery. Plaintiff's emphasis as to MMC's involve-

ment in the NME proceedings at best shows MMC to be a "neighborhood bully." As mentioned above, however, in sham exception analysis this Court is not to be concerned with unfair or unethical conduct that does not in some reasonably related way center on abuse of that government process which directly affects the plaintiff. Third, plaintiff has failed to respond to this issue in both its response and supplemental response to defendant MMC's motion to dismiss. Accordingly, plaintiff concedes this argument. *See* Local Rule 6.2.

*supra,* 664 F.2d at 897, quoting *Wilmorite Inc. v. Fagan Real Estate, Inc.,* 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd without opinion,* 578 F.2d 1372 (2nd Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978).

Viewed under the totality of circumstances of this case, the Court concludes that plaintiff has failed to sufficiently allege that defendants, by design, intended to injure plaintiff through *abuse* of the state's decision-making machinery. In other words,

> [p]laintiff's claim is simply that defendants opposed plaintiff's application before the [state agencies] and that their opposition was motivated solely by anticompetitive intent. *Noerr-Pennington* protects such opposition from antitrust liability.

**22.** The Court

> recognize[s], of course, the plaintiff's sincere hopes and expectations that the discovery process will yield concrete factual data to fill these voids and the principles of notice pleading in the Federal rules, but [the Court] cannot ignore important countervailing constitutional principles. To allow the complaint to stand on the basis of these expectations ... would certainly deter antitrust violators, but would at the same time seriously endanger the exercise of protected statutory and constitutional rights, a result which has been countermanded under *Noerr.*

*Bethlehem Plaza v. Campbell,* 403 F.Supp. 966, 971 (E.D.Penn.1975); *see also Leibowitz, supra,* 608 F.Supp. at 183, citing *Franchise Realty, supra,* 542 F.2d at 1082.

**23.** In Count Two plaintiff alleges that "the defendants and coconspirators have engaged in an unlawful combination and conspiracy to *boycott* St. Joseph's in *per se* violation of Section 1 of the Sherman Act. 15 U.S.C. § 1." Amended Complaint at 23, ¶ 53 (emphasis added). In its brief of August 31, 1984, at 15, n. 12, MMC argued that plaintiff's allegations fail to state a claim. More specifically, that plaintiff has alleged no facts showing that the defendants acted in concert with other competitors at a specific market level to exclude plaintiff from that market. Nor does plaintiff plead facts showing that defendants engaged in efforts with others to disadvantage plaintiff "by 'either directly denying or persuading or coercing suppliers or [patients] to deny relationships the [plaintiff] need[s] in the competitive struggle.'" *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* — U.S. —, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (citations

*Garst v. Stocco, Inc., supra,* 604 F.Supp. at 332.

■ Therefore, "[a] rational trier of fact could not conclude that the [defendants' litigational activities] were a sham and therefore not immune from antitrust liability." [22] *Aydin v. Local Corp., supra,* 718 F.2d ,at 903. On these grounds the defendants' motions to dismiss the complaint are GRANTED.[23]

### E. No "Concerted" Action

■ Alternative grounds exist to support this Court's dismissal of the complaint. Counts One and Two of the complaint are founded on § 1 of the Sherman Act. That section requires some agreement, express or implied, between two or more persons.[24]

omitted). At best plaintiff is simply pointing to the natural consequences relating to the competitive edge MMC currently enjoys from its position as provider of the cardiac services for which plaintiff seeks its CON. By juxtaposing this with the alleged abusive conduct for which no claim has been stated, plaintiff somehow attempts to build a boycott claim. Suffice it to say that this is at best a meritless spin off of the sham exception argument and therefore no boycott claim is stated. Plaintiff has simply failed to plead facts showing that MMC "banded together with other competitors to protect [itself] from non-group competitors." *Indiana Federation of Dentists v. F.T.C.,* 745 F.2d 1124, 1136 (7th Cir.1984), *app. for cert. pending,* 54 LW 3007 (July 9, 1985).

Additionally, plaintiff has failed to respond to MMC's motion and argument on this point. It is thus unopposed. Local Rule 6.2. Therefore, this Count also is dismissed.

**24.** Section 1 of the Sherman Act provides in pertinent part:

> Every contact, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination hereby declared to be illegal shall be deemed guilty of a felony.

15 U.S.C. § 1.

In contrast, "[t]he conduct of a single firm is governed by § 2 alone and is unlawful *only* when it threatens actual monopolization." *Copperweld, supra,* 467 U.S. at —, 104 S.Ct. at 2740, 81 L.Ed.2d at 641. (emphasis added). "[P]urely unilateral conduct is illegal only under

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Monsanto Co. v. Spray-Rite Service Corporation*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Orval Sheppard Real Estate Co. v. Valinda Freed*, 608 F.Supp. 354, 357 (M.D.Ala. 1985). Stated differently, unless plaintiff can show concerted, rather than unilateral activity, there can be no liability under § 1 of the Act. "As one cannot clap with one hand, and it takes two to tango, so in a § 1 case there must be proof of more than solitary conduct; there must be proof of concerted action." *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 893 (3rd Cir.1981), quoted in *McMorris v. Williamsport Hosp.*, 597 F.Supp. 899, 913–914 (M.D. Pa.1984). In *Copperweld*, for example, the Supreme Court held that a parent company and its wholly owned subsidiary are legally incapable of conspiring with each other under that section.

 Plaintiff ties HCA[25] to the actions of MMC by alleging that the misrepresentation letter was signed by an HCA employee. Complaint at 11, ¶ 31. Plaintiff also alleges (and apparently this is undisputed) that HCA was retained by MMC to manage Memorial Hospital.

Generally, a ¶ 1 conspiracy cannot be found between a corporation and its employees. *Tose, supra,* 648 F.2d at 893–894. Indeed, a corporation does not violate § 1 "when it exercises its rights through its officers and *agents,* which is the only medium through which it can possibly act." *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925 (1953) (emphasis added); *see also Leibowitz, supra,* 608 F.Supp. at 179–180 (Complaint alleging that attorney representing corporate defendant was engaged in antitrust conspiracy with broadcaster organization client was dismissed due to plaintiff's failure to allege that attorney held independent economic

interest with client or any other interest beyond that of attorney-client relationship). The *Nelson* reasoning has been applied even where agents were shown to have limited outside interests in the same business area but were nevertheless "at all pertinent times acting on behalf of the corporation and not as individuals...." *Hatley v. American Quarter Horse Ass'n.*, 552 F.2d 646, 654 n. 7 (5th Cir.1977).

In the instant case it is not alleged that HCA otherwise competes with plaintiff in the relevant market area. Nor is there any credible suggestion that HCA was, except in a remote sense, not acting in MMC's interest when it participated in the CON process. Thus, in *substance* all that is alleged here is that a managing agent acted in the interest of its principal, and that the actions stemmed from one corporate conscience, rather than from two independent competitors who have unlawfully combined to injure competition.

"An exception to the rule exists for the rare instance in which employees [or agents] have an independent personal stake in achieving the object of the conspiracy." *H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239, 244 (5th Cir.1978); *see also Weiss v. York Hosp.*, 745 F.2d 786, 813, n. 43 (3rd Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Johnston v. Baker*, 445 F.2d 424, 427 (3rd Cir.1971). Apparently in response to this, plaintiff's amended complaint at ¶ 40A, alleges that

HCA has an independent personal stake in both relevant markets [*i.e.,* the medical-surgical and cardiac-surgical markets alleged in ¶¶ 22 & 26 of the complaint] as defined herein and the success of the conspiracy and combination among defendants and co-conspirators. HCA's interest is demonstrated, *inter alia,* by its proposals and efforts to enter into a joint venture with Memorial or supply financ-

---

§ 2 and not under § 1. Monopolization without conspiracy is unlawful under § 2, but restraint of trade without a conspiracy or combination is not unlawful under § 1." *Id.,* 467 U.S.

at —, 104 S.Ct. 2740 n. 13, 81 L.Ed.2d at 641 n. 13.

**25.** For convenience, the Court will refer to both HCA and HCAM as "HCA."

ing in exchange for a management contract on that facility.

This allegation supplies no basis for the application of the *"H & B"* exception. The first sentence of the paragraph alleges no facts to support its conclusion and is thus conclusory. The second sentence refers to conduct alleged in ¶¶ 22–24 of the complaint, which itself focuses on conduct affecting only the general "medical-surgical" market, and not the "cardiac-surgical" market.[26] In that regard, defendant HCA correctly points out that it is only in the latter market in which plaintiff claims that it has been injured by the "misrepresentation" conduct, or any conduct, for that matter, of any defendant.[27] HCA's June 25, 1985 brief at 13.

Furthermore, the "personal stake" exception requires that 1) a benefit flow to the agent from the competitive harm to the plaintiff and 2) that the benefit to the agent is not inextricably bound to and solely derived from the benefit to the principal. Here, it is not alleged that HCA also competed with plaintiff and thus enjoyed an independent (anticompetitive) benefit, only that its principal (MMC) so benefitted. It follows that it can only be inferred that HCA realized at most a putative enhancement of its *management* (and, arguably, its investment) relationship with MMC because HCA assisted MMC in its efforts. That is, HCA benefitted because MMC benefitted. Furthermore, in this context any "independent benefit" would by its nature be too remote for § 1 purposes. While a corporate servicing agent may benefit from the corporation's elimination of a rival because that corporation can in turn offer more lucrative agency contracts, this would not, in the absence of speculation, translate into a finding that the agent derived a benefit as a *competitor* to the injured party, or, for that matter, as a fellow competitor with the corporate principal; rather, it would signify at best that the agent received an indirect portion of its principal's gains.

In this area of analysis, "substance, not form, should determine whether [HCA & HCAM are] capable of conspiring [with MMC] under § 1." *Copperweld, supra,* 467 U.S. at ——, 104 S.Ct. at 2743 n. 21, 81 L.Ed.2d at 645 n. 21; *Weiss, supra,* 745 F.2d at 815. The complaint fails to allege that HCA, in substance, acted as a conspirator within the meaning of § 1 of the Sherman Act.[28]

Because adequate grounds exist to support the dismissal of plaintiff's complaint, it is not necessary for this Court to reach defendants' remaining arguments.

To summarize, defendants' motions to dismiss the complaint for failure to state a claim are GRANTED.

---

26. Under the liberal standards of *Conley v. Gibson, supra,* it might be possible to construe these allegations to include, indirectly, the cardiac-surgical market in these allegations, since the NME/West End project to which plaintiff refers *might possibly* have included a cardiac-surgical element. But this by necessity would involve sheer speculation and is simply too remote a possibility to support plaintiff's *implicit* suggestion that an independent interest exists to invoke the *H & B* exception.

27. In fact, plaintiff conceded in its December 21, 1984 opposition brief at 6, n. 2, that it has not been injured by any defendant's conduct in connection with the "West Side" project.

28. Relatedly, the allegations concerning the recent incorporation of Memorial Medical Center as the long-term lessee of the hospital supply no additional grounds in support of plaintiff's allegations. At best plaintiff alleges that MMC, Inc. joined in the latter stages of the litigation in this case, *see St. Joseph's I & II, supra,* but there are no allegations of conduct not protected by the *Noerr-Pennington* doctrine. Nor are there any *"Copperweld"* allegations.