**ST. JOSEPH'S HOSPITAL, INC.,**
Plaintiff-Appellant,

v.

**HOSPITAL CORPORATION OF AMERICA, HCA Management Company, Chatham County Hospital Authority d/b/a Memorial Medical Center and Memorial Medical Center, Inc.,** Defendants-Appellees.

No. 85–8660.

United States Court of Appeals,
Eleventh Circuit.

Aug. 5, 1986.

Rehearing and Rehearing En Banc
Denied Sept. 9, 1986.

---

J. Marbury Rainer, Rufus T. Dorsey, IV, John H. Parker, Jr., Atlanta, Ga., for plaintiff-appellant.

D. Robert Cumming, Jr., Thomas A. Varlan, John A. Chandler, Atlanta, Ga., for Chatham County/MMC.

Kevin D. McDonald, Joe Sims, Washington, D.C., for Hosp. Corp. of America & HCA Management.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

ALLGOOD, Senior District Judge:

This appeal arose out of an action brought by St. Joseph's Hospital, Inc., against Hospital Corporation of America, HCA Management Company, and Chatham County Hospital Authority d/b/a Memorial Medical Center, for alleged violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.[1] The United States District Court for the Southern District of Georgia, 620 F.Supp. 814, granted the defendant's motion to dismiss for failure to state a claim upon which relief could be granted and this appeal followed.

After a careful review of the entire record and the applicable law, this court has concluded that in accordance with Fed. R.Civ.Proc. 8(a)(2) the plaintiff's complaint is sufficient to put the defendants on notice of an antitrust cause of action.

*Facts*

St. Joseph's Hospital, Inc., is a Georgia non-profit general acute care hospital in Savannah, Georgia. Chatham County Hospital Authority, d/b/a Memorial Medical Center (MMC), is also a licensed, non-profit general acute care hospital in Savannah, Georgia. Hospital Corporation of America (HCA) is a for-profit corporation which op-

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge, Northern District of Alabama, sitting by designation.

1. 15 U.S.C. § 1 reads in pertinent part:
  Every contact, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 2 reads in pertinent part:
  Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

erates over 218 HCA owned and non HCA owned hospitals world wide and manages another 175 hospitals. HCA Management Company (HCAM) is the wholly owned subsidiary of HCA that manages MMC.

Under Georgia's Health Planning and Development Act of 1983, all health care facilities are required to obtain a certificate of need (CON) from the State Health Planning Agency (SHPA) prior to the implementation or expansion of any health service.[2]

Each CON application is reviewed individually according to a process which requires consideration of a number of health planning issues, including the existing services in an area and the need for additional services.[3] Any interested party may submit information to SHPA in connection with the application. This initial review is conducted without an evidentiary hearing. The Georgia Act provides for a separate Health Planning Review Board (Review

2. *See,* GA.CODE § 31–6–1, *et seq.*

3. GA.CODE § 31–6–42. Qualifications for issue of certificate.

(a) The written findings of fact and decision, with respect to the planning agency's grant or denial of a certificate of need, shall be based on the applicable considerations specified in this Code section and reasonable rules promulgated by the planning agency interpretive thereof. The planning agency shall issue a certificate of need to each applicant whose application is consistent with the following considerations and such rules deemed applicable to a project, except as specified in subsection (d) of Code Section 31–6–43:

(1) The proposed new institutional health services are reasonably consistent with the relevant general goals and objectives of the state health plan;

(2) The population residing in the area served, or to be served, by the new institutional health service has a need for such services;

(3) Existing alternatives for providing services in the service area the same as the new institutional health service proposed are neither currently available, implemented, similarly utilized, nor capable of providing a less costly alternative, or no certificate of need to provide such alternative services has been issued by the planning agency and is currently valid;

(4) The project can be adequately financed and is, in the immediate and long term, financially feasible;

(5) The effects of new institutional health service on payors for health services, including governmental payors, are not unreasonable;

(6) The costs and methods of a proposed construction project, including the costs and methods of energy provision and conservation, are reasonable and adequate for quality health care;

(7) The new institutional health service proposed is reasonably financially and physically accessible to the residents of the proposed service area;

(8) The proposed new institutional health service has a positive relationship to the exist-

ing health care delivery system in the service area;

(9) The proposed new institutional health service encourages more efficient utilization of the health care facility proposing such service;

(10) The proposed new institutional health service provides, or would provide, a substantial portion of its services to individuals not residing in its defined service area or the adjacent service area;

(11) The proposed new institutional health service conducts biomedical or behavioral research projects or new service development which is designed to meet a national, regional, or state-wide need;

(12) The proposed new institutional health service meets the clinical needs of health professional training programs which request assistance;

(13) The proposed new institutional health service fosters improvements or innovations in the financing or delivery of health services, promotes health care quality assurance or cost effectiveness, or fosters competition that is shown to result in lower patient costs without a loss of the quality of care; and

(14) The proposed new institutional health service fosters the special needs and circumstances of health maintenance organizations.

\* \* \* \* \* \*

(d) For the purposes of the considerations contained in this Code section and in the planning agency's applicable rules, relevant data which were unavailable or omitted when the state health plan or rules were prepared or revised may be considered in the evaluation of a project.

(e) The planning agency shall specify in its written findings of fact and decision which of the considerations contained in this Code section and the planning agency's applicable rules are applicable to an application and its reasoning as to and evidentiary support for its evaluation of each such applicable consideration and rule. (Code 1981, § 31–6–42, enacted by Ga.L.1983, p. 1566, § 1; Ga.L.1984, p. 22, § 31.)

Board) to handle any appeals from SHPA decisions. The Review Board, at its discretion, grants discovery rights prior to conducting a mandatory evidentiary hearing.[4]

4.  GA.CODE § 31-6-44. Health planning review board; administrative and judicial review of agency decisions.

(a) There is created the Health Planning Review Board, which shall be an agency separate and apart from the planning agency. The review board shall be composed of ten members appointed by the Governor, one from each congressional district, and shall include two attorneys. The Governor shall appoint persons to the board who are familiar with the health care industry but who do not have a financial interest in any health care facility. The Governor shall also name the chairman of the review board who shall be an attorney. The purpose of the review board shall be to conduct appeal hearings on decisions of the planning agency, as set forth in this Code section. The review board shall promulgate reasonable rules for its operation and rules of procedure for the conduct of its hearings. The members of the review board shall receive no salary, but shall be reimbursed for their expenses in attending meetings and for transportation costs as authorized by Code Section 45-7-21, which provides for compensation and allowances of certain state officials, and shall also be compensated for services rendered to the review board outside of attendance at an appeal hearing. Such compensation to the members of the review board shall be made by the Department of Administrative Services.

(b) Any applicant for a project, or any competing applicant, or any competing health care facility that has notified the planning agency prior to its decision that such facility is opposed to the application before the planning agency, or any county or municipal government in whose boundary the proposed project will be located, who is aggrieved by a decision of the planning agency shall have the right to an appeal hearing before a three-member panel of the review board or to intervene in such hearing. Such hearing shall be the administrative remedy for decisions of the planning agency. Such hearing shall be requested within 30 days of the effective date of a decision made pursuant to Code Section 31-6-43. The chairman of the review board shall name the panel for each such hearing, and the panel shall include one lawyer, who shall be the chairman of the panel, and two nonlawyer members of the review board. The member of the review board from the congressional district in which the proposed project is located shall be one of such three members of the panel. The chairman of the panel shall make such rulings as may be required for the conduct of the hearing. The chairman of the panel shall also make all arrangements for scheduling of the hearing.

(c) In fulfilling the functions and duties of this chapter, the panel shall act, and the hearing shall be conducted as a full evidentiary hearing, in accordance with Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," relating to contested cases, except as otherwise specified in this Code section. All files, working papers, studies, notes, and other writings or information used by the planning agency in making its decisions shall be public records and available to the parties, and the chairman of the panel may permit each party to exercise such reasonable rights of prehearing discovery of such information used by the parties as will expedite the hearing.

(d) The issue for decision by the panel shall be whether, and the panel shall order the issuance of a certificate of need if, in the panel's judgment the application is consistent with the considerations as set forth in Code Section 31-6-42 and the planning agency's rules, as the panel deems such considerations and rules applicable to review of the project. The panel shall also consider whether the planning agency committed prejudicial procedural error in its consideration of the application. The panel shall make written findings of fact and conclusions of law as to each such consideration or rule, including a detailed statement of the reasons for the decision of the panel. Appellant or applicants shall proceed first with their cases before the panel in the order determined by the chairman of the panel, and the planning agency, if a party, shall proceed last. In the event of a consolidated hearing on applications which were joined pursuant to subsection (d) of Code Section 31-6-42, the review board shall have the same powers specified for the planning agency in subsection (d) of Code Section 31-6-42 to issue no certificate of need or one or more certificates of need.

(e) Unless otherwise agreed by the parties, all evidence shall be presented at the hearing. A party or intervenor may present any relevant evidence on all issues raised by the panel or any party to the hearing or revealed during discovery, except that, unless in response to an issue raised by an opponent or the panel or revealed during discovery, a party or intervenor may not present a new need study or analysis that is substantially different from any such study or analysis submitted to the planning agency prior to its decision and that could reasonably have been available for submission to the planning agency prior to its decision. Except for such limitation on new studies or analyses, the panel may consider the latest data available, including updates of studies previously submitted, in deciding whether an application is consistent with the applicable considerations and rules.

(f) After the issuance of a decision by the planning agency, no party to an appeal hear-

In October, 1983, St. Joseph's filed an application with SHPA for a CON to enable it to expand its cardiac care services to include cardiac surgical services. St. Joseph's currently provides a full range of cardio-vascular diagnostic and treatment services, including cardiac catheterizations, but is forced to transfer patients needing cardiac surgery to MMC. MMC is the only hospital in Southeast Georgia authorized by SHPA to provide cardiac surgery services. MMC opposed St. Joseph's application and in a letter to SHPA dated January 4, 1984, stated that it has the capacity to perform 1500 open heart procedures per year which far exceeds the requirements of the region.

In February 1984, prior to issuing a decision on St. Joseph's application, SHPA adopted the "New Cardiac Surgery Rule," SHPA Rule 272-2-09(13), which states:

> Adult cardiac surgery services and pediatric cardiac catherization and surgical services are reasonably available and distributed in the State consistent with the need for such services. Absent major population changes, the availability and accessibility of these services fulfill the State's current requirement. This policy will be evaluated at least every two years unless the need is otherwise displayed.

On April 6, 1984, St. Joseph's request for a CON was denied. SHPA determined that the additional open heart services at St. Joseph's would unnecessarily duplicate the services being provided by MMC. Because SHPA determined the need for additional open heart surgery had not been shown, it concluded that the requirements of agency rule 272-2-09(13) had not been met and the application was denied.

St. Joseph's appealed SHPA's denial to the Review Board on April 27, 1984. MMC was not a party to those proceedings but actively tried to have the appeal dismissed without a hearing by encouraging SHPA to move for a dismissal. The Hearing Panel Chairman, John Woodall, refused to grant SHPA's motion to dismiss and ruled that St. Joseph's was entitled by statute to a full evidentiary hearing. MMC then requested the right to intervene. In spite of some reservations Woodall granted the motion. In arguing the motion to intervene MMC stated that it would do nothing to obstruct or delay the proceedings. However, as soon as MMC was allowed to intervene, it began a course of conduct designed to delay the proceedings. Pursuant to a motion filed by MMC, John Sibley, Chairman of the Review Board, disqualified Woodall as the hearing officer because Woodall had previously represented St. Joseph's insurance carrier in workmen's com-

ing, nor any person on behalf of any such party, shall make any ex parte contact with any member of the review board in regard to a project under appeal.

(g) The decision of the panel shall be the final administrative decision for purposes of judicial appeal of any certificate of need decision under Chapter 13 of Title 50, the "Georgia Administrative Procedure Act."

(h) In the event that the review board, its chairman, or a panel of the review board requires legal counsel, the chairman shall make a request for such advice to the Attorney General.

(i) Any party to the appeal hearing, including the planning agency, may seek judicial review of the panel's decision in accordance with the method set forth in Chapter 13 of Title 50, the "Georgia Administrative Procedure Act"; provided, however, that in conducting such review, the court may reverse or modify the decision only if substantial rights of the appellant have been prejudiced because the procedures followed by the planning agency, or the review board, or the administrative findings, inferences, conclusions, and decision of the review board are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedures;

(4) Affected by the other error of law;

(5) Not supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. (Code 1981, § 31-6-44, enacted by Ga.L.1983, p. 1566, § 1.)

pensation cases. Sibley appointed himself as the hearing officer. MMC again filed a motion to dismiss the appeal and, before a ruling was made on that motion, filed a request to stay the appeal. Sibley granted the request for a stay, pending determination of the validity of the New Cardiac Surgery Rule and its application to St. Joseph's CON by the courts.

On the same date that the stay was issued, St. Joseph's filed a petition and complaint for mandamus and injunctive relief in Fulton Superior Court requesting the stay be lifted and the hearing granted. On August 17, 1984 the stay was lifted. *St. Joseph's Hospital, Inc. v. Sibley*, Civil Action No. C–12402 (Fulton Superior Ct., August 17, 1984). A hearing was conducted on September 5, 1984 and on December 6, 1984 the Review Board found that need had been shown for the additional cardiac services proposed by St. Joseph's. However, the Review Board determined that under the New Cardiac Surgery Rule only SHPA could issue the CON and that even SHPA could not issue the CON until the validity of the rule had been resolved by the Georgia Court of Appeals. The Georgia Court of Appeals already had before it two cases in which the New Cardiac Surgery Rule was being challenged. Those appeals were ultimately dismissed on jurisdictional grounds. *State Health Planning Review Board v. Piedmont Hospital*, 173 Ga.App. 450, 326 S.E.2d 814 (1985). Following the decision in which the stay was lifted St. Joseph's filed a complaint and petition for review in the Superior Court of Chatham County. The court agreed with the Review Board's findings on the merits of the application, but rejected the Review Board's determination that only SHPA could make the ultimate determination of whether "need was otherwise displayed" and issue the CON. The court modified the Review Board's decision to direct SHPA to issue the CON. MMC appealed to the Georgia Court of Appeals.

On April 4, 1986, a final order was issued by the court of appeals. *Chatham County*

*Hospital Authority v. St. Joseph's Hospital, Inc.*, 344 S.E.2d 463 (Ga.App.1986). The court determined that the New Rule does not require a moratorium on considering applications for a certificate and affirmed the superior court's and the board's finding that need for the additional services had been shown.

In August, 1984, before the superior court's decision, St. Joseph's filed a complaint in federal court, alleging that the defendants had conspired to prevent St. Joseph's establishment of a cardiac surgery program in violation of the Sherman Antitrust Act. St. Joseph's also charged the defendants with monopolizing or attempting to monopolize trade in violation of § 2 of the Sherman Antitrust Act. The central focus of St. Joseph's allegations was that the defendants had submitted false information to SHPA and SHPA relied on that information in denying St. Joseph's application. St. Joseph's also charged the defendants with acting in bad faith to obstruct, delay and prevent St. Joseph's obtaining a hearing and later a review of the adverse decision.

HCA and MMC each filed a 12(b)(6) motion to dismiss. St. Joseph's filed an amended complaint; and the defendants again filed motions to dismiss. The district court granted the motions without granting the plaintiff leave to amend. This appeal followed.

*Motion to Dismiss*

Although authorized by the Federal Rules of Civil Procedure, the liberal rules as to the sufficiency of a complaint [5] make it a rare case in which a motion on this ground should be granted. "[I]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, at 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In spite of the defend-

**5.** *See* Fed.R.Civ.Proc. 8.

ant's protestations to the contrary the liberal standard of Rule 8 is also generally accepted as the standard in an antitrust action. *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Quinonez v. National Association of Securities Dealers, Inc.,* 540 F.2d 824 (5th Cir.1976).

The short statement must be plain and must show the pleader is entitled to relief. The pleading "must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." Wright & Miller, *Federal Practice and Procedure:* Civil § 1216 at 121–23.

In ruling on the motion to dismiss the district court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff.

The district court based its dismissal of the complaint on the erroneous conclusion that the defendants' actions were protected by the *"Noerr-Pennington* Doctrine" and did not come within the "sham exception" to that doctrine. The court also held that the plaintiff failed to allege that HCAM was anything more than a mere employee of Memorial and could not be a co-conspirator without evidence of a personal stake in the outcome.

On appeal St. Joseph's argues that the district court erred in granting the motion to dismiss. St. Joseph's contends that the complaint sufficiently alleged statements and actions by the defendants which violated the Sherman Act and put the defendants on notice as required by Fed.R.Civ.Proc. 8(a)(2). St. Joseph's also contends that the defendants represent separate interests sufficient to support the allegations of a conspiracy under § 1 of the Sherman Act.

*The Noerr-Pennington Doctrine*

The *Noerr-Pennington* doctrine was established in a trio of Supreme Court decisions. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In *Noerr, supra,* a group of railroads conducted a publicity campaign designed to damage the image of truck drivers and persuade the Pennsylvania legislature to enact laws which would be detrimental to the trucking industry. The Supreme Court found no violation of the Sherman Act in those actions and held that Sherman Act liability could not be predicated on "mere attempts to influence the passage or enforcement of laws." 365 U.S. at 135, 81 S.Ct. at 528. The Court reasoned that

> In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act. Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Id.* at 137–138, 81 S.Ct. at 529–530.

The Court also recognized the rights of the people to petition their government even if they only had an anti-competitive motive. The Court did recognize that there

could be instances where the actions could be "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533. However, that was not the case before it.

The *Noerr* ruling was reaffirmed in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Pennington* a group of large coal companies and the UMW persuaded the Secretary of Labor to adopt high minimum wage rates for companies supplying coal to the Tennessee Valley Authority. The Court found no Sherman Act violations in their actions and said, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593.

The *Noerr* immunity was extended to administrative and judicial proceedings in *Trucking Unlimited, supra,* and for the first time the Court utilized the exception to the general immunity, saying:

> Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.,* effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

*Id.* 404 U.S. at 513, 92 S.Ct. at 613.

The *Trucking Unlimited* court also said, "There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Id.* at 513, 92 S.Ct. at 613.

■ The district court in a rather lengthy opinion focused almost entirely on the "sham exception" and whether the plaintiffs had alleged a cause of action which would come within that exception. In order to find that a situation falls within an exception to a general rule, it must first be clear that the general rule itself is applicable. The plaintiff here has alleged misrepresentations before a governmental agency. When a governmental agency such as SHPA is passing on specific certificate applications it is acting judicially. Misrepresentations under these circumstances do not enjoy *Noerr* immunity.

■ As to the delaying tactics, motions to dismiss and appeals, St. Joseph's failed to allege that the defendants did anything more than use the adjudicatory process to obtain a favorable outcome. In spite of the damaging effect, the defendants were within their rights to use every available legal means to delay or forestall the CON being issued and the anti-competitive purpose did not make them illegal. "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." 381 U.S. at 670, 85 S.Ct. at 1593. Likewise, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593.

Thus, while the delaying tactics of the defendants are clearly immune from antitrust liability, the furnishing of misinformation to SHPA is not entitled to the same protection.

*Conspiracy*

As an alternative ground for dismissing the complaint the district court found that

St. Joseph's had failed to show that two independent competitiors had "unlawfully combined to injure competition," as required by § 1 of the Sherman Act. As to HCA and HCA Management, the court relied on the holding of the Supreme Court in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that a parent company and its wholly owned subsidiary are legally incapable of conspiring with each other, and their activity must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act.

As to HCA Management and MMC, the district court found there could be no conspiracy between a corporation and its employee, relying on *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879 (3rd Cir. 1981), *cert. denied* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir.1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

According to the plaintiff the relationship of the parties is not as simple as the district court views it. The plaintiff contends that while HCAM is a wholly owned subsidiary of HCA, its status as an employee of MMC is more complicated than the usual employer-employee situation. In this case the employee is a separate corporate entity with an entirely separate board of directors, and the employee is in the business of managing hospitals for a profit. As such, St. Joseph's argues that HCA/HCAM had the independent corporate existence plus the independent interest and motive necessary to support a conspiracy claim under § 1 of the Sherman Act.

As the Seventh Circuit pointed out in *Tamaron Distributing Corporation v. Weiner*, 418 F.2d 137 (7th Cir.1969), *Nelson Radio*

> does not preclude a conspiracy or combination between a corporation and *any agent*. The guiding principle is the requirement that there be more than one independent business entity involved in the combination or conspiracy. Thus in *Nelson Radio*, the court properly held

that the corporation could not conspire with its managing officers and agents who maintained no business identity separate from the corporation itself. On the other hand, where there are distinct entities, the existence of an "agency" relationship between them does not foreclose a violation of Section 1 of the Act.

Id. at 139.

The courts have repeatedly noted that, while a corporation's officers and its employees are legally incapable of conspiring among themselves, if the "officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employers for purposes of Section 1." *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482 (3rd Cir.1985), appeal pending; *H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239 (5th Cir.1978). *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir.1974).

■ St. Joseph's alleged that HCA and MMC were separate entities with separate economic interests but failed to support the allegations with sufficient facts to show that anyone other than MMC had an "independent personal stake" in the outcome of the conspiracy. St. Joseph's should be given an opportunity to amend the complaint, if it can, to show the missing elements.

*Section 2 of the Sherman Act*

■ St. Joseph's has also alleged a violation of § 2 of the Act. The district court did not distinguish the claims under §§ 1 and 2 since it determined that the actions of the defendants were protected activity. Our determination that such action is not immune from antitrust action applies to both Sections 1 and 2.

Section 2 differs from § 1 in that it is not restricted to a conspiracy, but is aimed at, *inter alia*, the acquisition or retention of effective market control. Monopolies, attempted monopolies and conspiracies to monopolize any part of interstate commerce are a violation of § 2 of the Sherman Act.

In order to prove the charge St. Joseph's will have to show that the defendants had: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569 (11th Cir.1985).

*Conclusion*

For the above stated reasons, the court concludes that the dismissal of this action was premature and the order of the district court must be VACATED, the claims of the plaintiff under both §§ 1 and 2 of the Sherman Act be reinstated and the case REMANDED for further proceedings.